**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Google LLC, <br><br> Defendant. | Case No. ___1:25-cv-1755___ <br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Nature of the Action ........................................................................................................ 1

Parties ............................................................................................................................ 4

Jurisdiction and Venue ................................................................................................... 5

Facts .............................................................................................................................. 6

   I.   Digital Advertising Makes Today's Internet Possible ......................................... 6

   II.   Equativ and Sharethrough Innovate and Provide Best-In-Class Services Across the Ad Tech Stack ........................................................................................... 10

   III.   Google Wields Its Massive Size to Warp and Injure Competition Across the Ad Tech Stack ........................................................................................................ 12

      A.   Google Leverages Its Illegal Search Monopoly to Attract Advertisers to AdWords .... 12

      B.   Google Fortifies Its Advertising Dominance Through Acquisitions of DFP and AdX ........................................................................................................ 13

      C.   Google Consolidates Its Market Power by Restricting AdWords Demand to AdX ...... 14

      D.   Google Tightens Its Stranglehold Over the Ad Tech Stack by Tying AdX to DFP ...... 14

      E.   Google Further Squeezes Competing Ad Exchanges by Rigging DFP to Favor AdX with First Look ................................................................................... 17

      F.   Google Artificially Restricts the Transactions Available to Rivals from Its Demand-Side Platform, DV360 ................................................................... 18

      G.   Google Acquires AdMeld, a Tool Designed to Provide Publishers with Better Bid Transparency, to Shut It Down ...................................................... 20

      H.   Through Project Bernanke, Google Leverages Its Data Advantage to Squeeze Out Competing Ad Exchanges and Sources of Advertiser Demand ................ 20

      I.   Spurred by Google's Monopolistic Overreach, Publishers and Rival Ad Exchanges Develop Header Bidding ................................................................... 22

      J.   Google Perceives Header Bidding as a Threat and Moves to Quash It ...................... 23

         1.   Last Look .............................................................................................. 23

         2.   Open Bidding ......................................................................................... 24

         3.   Sell-Side Dynamic Revenue Sharing ..................................................... 25

4.    Project Poirot ........................................................................... 25

5.    Unified Pricing Rules............................................................... 26

K.    Google's Anticompetitive Conduct Continues to This Day............................ 27

IV.    Relevant Markets and Google's Monopoly Power ........................................... 28

A.    Relevant Product Markets ...................................................................... 28

1.    Publisher Ad Servers for Open-Web Display Advertising.............................. 28

2.    Ad Exchanges for Open-Web Display Advertising .................................. 30

3.    Ad Exchanges for Indirect Open-Web Display Advertising.................................... 33

B.    Relevant Geographic Markets.................................................................... 33

1.    Worldwide Market .......................................................................... 33

2.    United States Market.......................................................................... 34

C.    Google Has Monopoly Power in the Relevant Markets ................................. 36

1.    Google Has Monopoly Power in the Worldwide and U.S. Markets for Publisher Ad Servers for Open-Web Display Advertising.......................................... 36

2.    Google Has Monopoly Power in the Worldwide and U.S. Markets for Ad Exchanges for Open-Web Display Advertising and Indirect Open-Web Display Advertising ........... 37

V.    Google Has Already Been Found Liable for Monopolizing Relevant Markets and Tying ................................................................................. 38

VI.    Google's Anticompetitive Conduct Has Harmed Competition and Injured Equativ and Sharethrough........................................................................... 40

VII.    Equativ's and Sharethrough's Claims Are Timely ........................................... 46

Violations Alleged................................................................................ 51

Request for Relief................................................................................ 60

Demand for Jury Trial........................................................................... 61

## NATURE OF THE ACTION

1.     Google is a monopolist.

2.     This is not hyperbole or invective. Rather than devoting itself to the betterment of its customers' lives through technological innovation or simply improving its products, an ever-flowing wellspring of internal documents and communications shows that the technology monolith has deployed its vast size and resources to causing harm: harm to businesses who seek to compete with it, and harm to competition itself.

3.     In 2023, a jury thus determined unanimously that Google, through its anticompetitive conduct, had illegally monopolized markets for Android application distribution and billing services. Verdict, *In re Google Play Store Antitrust Litigation*, No. 3:20-cv-05671-JD (N.D. Cal. Dec. 11, 2023).

4.     In August 2024, Judge Amit P. Mehta of the United States District Court for the District of Columbia held that Google, through its anticompetitive acts, had illegally monopolized markets for general search services and search text ads: "Google is a monopolist, and it has acted as one to maintain its monopoly." *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. 2024).

5.     And in April 2025, Judge Leonie M. Brinkema of the United States District Court for the Eastern District of Virginia held that Google had illegally monopolized markets for publisher ad servers and ad exchanges for open-web display advertising: "In addition to depriving rivals of the ability to compete, this exclusionary conduct substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web." *United States v. Google LLC*, 778 F. Supp. 3d 797, 873 (E.D. Va. 2025) ("Liability Op.").

1

6.      Plaintiffs Equativ SAS and Equativ Inc. (together "Equativ") and Sharethrough Inc. and Sharethrough USA, Inc. (together "Sharethrough") are among the rivals that Google, through its exclusionary conduct, deprived of the ability to compete on the merits in the publisher ad server and ad exchange markets. Equativ and Sharethrough thus bring this suit as a follow-on action to *United States v. Google LLC*, Case No. 1:23-CV-108-LMB-JFA (E.D. Va.), to remedy the harms that Google has caused.

7.      Equativ, which offers a full suite of ad tech products including a publisher ad server and ad exchange, is Google's most significant publisher ad server rival. Sharethrough operates a leading ad exchange, at the forefront of innovation to make online ads more effective and relevant to advertisers, publishers, and the consumers who see them. In 2024, Equativ acquired Sharethrough, with the aim of combining the two companies' strengths to provide high-quality advertising technologies at scale. Equativ and Sharethrough have competed doggedly against Google in the markets it monopolized for more than a decade to serve customers and enable the advertising that funds the open internet.

8.      Yet free and fair competition with Google has been impossible due to Google's use of its monopoly power and its unlawful practices that have prevented competition on the merits—practices that continue to this day. "Google's monopolies in the publisher ad server and ad exchange markets . . . have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools . . . [which have] decreased product quality and harmed competition by further entrenching Google as the dominant company in open-web display advertising." Liability Op. at 864. Despite Google's tactics, Equativ and Sharethrough have survived by offering superior products and service, but their growth and scale have been significantly stunted by Google's anticompetitive conduct.

9.    Equativ and Sharethrough struggled to compete against Google for years, but only when investigations of the U.S. Department of Justice and European competition authorities laid bare Google's internal machinations were the true causes for the barriers to competition in ad tech exposed.

10.    By harnessing the immense advertising demand it generated through its illegal search monopoly, Google was able to force website publishers and advertisers to use its publisher ad server, DFP, and its ad exchange, AdX, to the exclusion of rivals' products. Ad servers and ad exchanges are the core tools used to buy, sell, and place ads on websites across the internet. After coercing publishers and advertisers onto its platforms, Google made it nearly impossible to escape. It is only through these anticompetitive tactics, rather than competition on the merits, that Google amassed an incredible 90% share of the publisher ad server market.

11.    On top of conditioning access to advertising demand from its search monopoly on using DFP and AdX, Google employed additional exclusionary tactics to ensure that no other publisher ad servers or ad exchanges would be able to compete and challenge its dominance. Google even hobbled the technological capabilities of its own platforms—to the detriment of publishers and advertisers—to prevent its customers from making use of competitors' tools.

12.    Google also harnessed the data it extracted from owning multiple pieces of the auction process to gain an unfair advantage. It learned how its competitors' ad exchanges would bid and developed a web of technical and policy devices to rig auctions so that AdX would always win more chances to show ads to consumers.

13.    In this way, and over the course of years, Google systematically and purposely stymied new entry and starved its ad tech competitors of the volume they need to scale and grow. Google executed these schemes in ways that harmed its own customers, providing

technologically inferior products, charging extraordinary fees and reducing revenues to publishers, and making it more challenging and expensive for advertisers to place relevant ads.

14.    The investigations of Google by the U.S. Department of Justice and European competition authorities have now exposed the many harmful ways that Google threw sharp elbows to injure competing businesses and then worked to conceal its illegal tactics. Through this lawsuit, Equativ and Sharethrough seek to be made whole for the harm that Google's anticompetitive conduct has caused them, and to stop Google from using its size to do further damage to competitors like Equativ and Sharethrough that it views as a threat to its illegal monopoly.

## PARTIES

15.    Plaintiff Equativ SAS is a French simplified joint-stock company with its principal place of business in Paris, France. Equativ (previously "Smart AdServer") launched in 2006 as a publisher ad server provider. Over the next two decades, Equativ SAS expanded its presence across the ad tech stack worldwide, including by offering an ad exchange.

16.    Plaintiff Equativ Inc. is a Delaware corporation with its principal place of business in New York, New York. Equativ Inc. is a subsidiary of Equativ SAS. Equativ SAS and Equativ Inc. work together to offer Equativ's products and services to publishers and advertisers in the United States.

17.    Plaintiff Sharethrough Inc. is a Canadian corporation with its principal place of business in Montreal, Quebec. Sharethrough was incorporated in 2008 and over time grew into one of the top global independent omnichannel ad exchanges in the world.

18.    Plaintiff Sharethrough USA, Inc. is a Delaware corporation with its principal place of business in New York, New York. Sharethrough USA, Inc. is a subsidiary of

Sharethrough Inc. Sharethrough Inc. and Sharethrough USA, Inc. work together to offer Sharethrough's products and services to publishers and advertisers in the United States.

19.     In June 2024, Equativ acquired Sharethrough. Today, Equativ and Sharethrough offer products at multiple levels of the ad tech stack, including not only the Equativ Ad Server and Equativ SSP (ad exchange) but also a curating platform, Maestro by Equativ, and a managed services demand-side platform, Equativ Managed DSP. Equativ and Sharethrough employ over 720 people across 18 countries with hundreds of millions of dollars in annual net recurring revenues, a majority of which is derived from their activities in North America.

20.     Google LLC is a Delaware limited liability company headquartered in Mountain View, California. Google is owned by the publicly traded company Alphabet Inc. Alphabet's "Google Network," which comprises Google's non-search display advertising revenue, generated approximately $30.36 billion in 2024. "The vast majority of Alphabet's revenues (nearly 80%) come from digital advertisements." *United States v. Google LLC*, 747 F. Supp. 3d 1, 35 (D.D.C. 2024).

## JURISDICTION AND VENUE

21.     Equativ and Sharethrough bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for damages resulting from and injunctive relief against threatened damage by Google's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

22.     This Court has subject-matter jurisdiction over Equativ's and Sharethrough's federal antitrust claims against Google under 28 U.S.C. §§ 1331, 1332, and 1337.

23.     This Court has personal jurisdiction over Google and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because Google transacts business and is found within this District. Google engages in, and its

activities substantially affect, interstate trade and commerce. Google provides a range of advertising technology products and services that are marketed, distributed, and offered to customers throughout the United States, within this District, across state lines, and internationally. Google operates data centers in Loudoun and Prince William Counties. Google maintains offices in Reston, Virginia. Google thus transacts business and is found within this District.

## FACTS

### I.    Digital Advertising Makes Today's Internet Possible

24.    Advertising is central to modern commerce. Across industries, businesses need to announce their products and services to the public. Advertisements fulfill that need. In turn, the advertising space that businesses purchase is the lifeblood of our nation's free press, and the main source of funding for the newspapers, magazines, and websites that people across the United States rely on for information, news, and entertainment.

25.    Digital advertising, and the advertising technology that facilitates it, makes today's internet possible. It is easy to take for granted the ability to move freely across the internet and to access websites, information, and media at no charge. But businesses that pay for advertisements ("advertisers") are the ones who foot the bill. In turn, the people who run the websites ("publishers") sell advertising space to pay for their hardware, software, employees, and content. Space on a website that is available for advertisements is often referred to as "inventory." Without the ability to charge for advertisements, much of the wealth of content that people expect to be freely accessible on the internet would not exist.

26.    Many of the ads that people see on their computers or mobile devices are "display ads." Display ads engage users with text or image advertisements, and typically link to the

advertiser's website or app. Although these ads are often shown as static images, they can include animations or video.

27.    An advertisement that appears on a website is called an "open-web display ad." Below is an example of an open-web display ad on the Rolling Stone website:



28.    Most publishers that run advertisements on their websites, including the overwhelming majority of newspapers and other traditional media organizations, rely on ad tech tools to sell their ad space inventory. The collection of tools that makes these transactions possible is called the "ad tech stack." It is cost-prohibitive for most publishers and advertisers to build their own sophisticated ad tech tools, and thus they rely on tools of third-party ad tech providers, like Equativ and Sharethrough.

29.    The ad tech stack that powers open-web display advertising consists of publisher ad servers, ad exchanges, demand-side platforms ("DSPs"), and ad networks:



30.    Open-web advertising appears seamless to website visitors, but behind the scenes this collection of ad tech tools automates the buying and selling of display ads at astonishing speed. This series of automated transactions is called "programmatic" advertising.

31.    Each instance a display ad is shown to an individual user is called an "impression." When a user visits a website, they may see several display ads, generating several impressions. The website publisher uses its publisher ad server, sometimes referred to simply as an ad server, to alert sources of advertising demand—typically, ad exchanges—that it has impressions for sale. The ad exchanges then pass information about the impressions to DSPs and advertiser ad networks (referred to collectively as "programmatic buying tools") to solicit bids from advertisers for this ad inventory. Publishers, and the publisher ad servers and ad exchanges that they use to sell impressions, are considered part of the "supply side" or "sell side" of advertising.

32.    Advertisers are often referred to as on the "demand side" or "buy side" of advertising. Advertisers and their ad agencies use DSPs like Google's Display & Video 360

("DV360") and The Trade Desk, or advertiser-facing sides of ad networks like Google AdWords (also referred to as "Google Ads"), to receive information about each impression and formulate a bid. After an ad exchange passes information about an available impression to DSPs and advertiser ad networks, advertisers use these programmatic buying tools to determine the bids to send back to the ad exchange. Each ad exchange aggregates the buy-side bids it received, typically selects the highest bid, and then communicates that bid to the website publisher's ad server.

33.    At the last step, the publisher uses an ad server to select the best bid. The publisher's selection of the best bid typically determines which ad to show the user. The ad server then executes the back-end processes of displaying the ad on the publisher's website.

34.    This entire process—from a user visiting a website, to the solicitation and subsequent bidding, and the display of the selected ad—takes place in the blink of an eye.

35.    At each step in this process, ad tech tools deduct fees from bids for the services they perform. For example, below is a Google-created diagram depicting Google extracting roughly $36 of every $100 in advertiser spending through fees for its various ad tech tools:



36.    At every level of the ad tech stack, scale is crucial to a provider's ability to compete. Greater scale creates stronger indirect network effects, which generates more data to develop and train algorithms and run experiments.

## II.    Equativ and Sharethrough Innovate and Provide Best-In-Class Services Across the Ad Tech Stack

37.    Equativ and Sharethrough are industry-leading omnichannel platforms that offer products at multiple levels of the ad tech stack. Equativ and Sharethrough facilitate advertising on over 100,000 websites, mobile apps, and connected TV apps worldwide.

38.    Equativ's mission is simple yet ambitious: To facilitate effective, innovative, sustainable, and human-centric advertising that helps maintain access to free, high-quality content, the preservation of a free press, and the open, independent internet. With high-quality, low-cost ad tech tools, Equativ and Sharethrough match publishers with the best-fitting ad for

any given impression, which means greater revenues for the publisher and more effective impressions for the advertiser. By unlocking value for publishers and advertisers alike, Equativ and Sharethrough are proud to encourage the free flow of information and content across the internet.

39.     Equativ first launched its publisher ad server, formerly known as Smart AdServer, nearly 20 years ago. Since that time, Equativ has continually innovated, improved, and optimized its ad server to increase demand for its publisher customers, provide actionable data, and maximize yield of the publishers' inventory. A wide array of publishers use Equativ's ad server to manage the advertising that funds their operations, including notable media companies like Sony Playstation, Imgur, Tumblr, and more.

40.     Equativ also operates an ad exchange, Equativ SSP. Equativ's ad exchange offers a suite of solutions that optimize performance and pricing, providing unparalleled value to publishers and advertisers. The quality of Equativ's ad exchange has attracted some of the world's most prominent brands as advertisers, including Paramount, Condé Nast, the Washington Post, and more. Customer survey data confirms that Equativ's SSP is best in class, with one customer remarking that Equativ has the "best user interface of all SSPs for ease of use," and another considering Equativ the "best platform out there."

41.     Consistent with the high quality of its products and the service it provides, Equativ has received numerous recognitions in ad tech, including for example the Digiday Awards of Europe Best Digital Product Innovation award for 2024, AdExchanger's 2024 Programmatic Power Players award for Top 50 Strategic Partners, the 2024 AdExchanger Award for Best Sustainability Initiative, the 2023 European Video Awards Best Video Ad Tech

Innovation award, and the Digiday Technology Awards Best Sustainable Ad Tech Platform award for 2022.

42.    In 2024, Equativ acquired Sharethrough. Sharethrough and its flagship product, the Sharethrough Exchange ("STX"), focus on placing ads with premium inventory that are more likely to capture a user's attention. Because of Sharethrough's emphasis on quality and placement, users who click on ads placed by Sharethrough spend 50% to 200% more time on the advertised website than users who arrive via other open-web display ads. Sharethrough prioritizes the design and layout of ads to maximally capture user attention, and curates ads to ensure that its high-quality ads appear in relevant contexts to drive consumer engagement. Equativ SSP and Sharethrough STX will soon be merged into a single ad exchange that combines the strengths of both products.

III.    **Google Wields Its Massive Size to Warp and Injure Competition Across the Ad Tech Stack**

A.    *Google Leverages Its Illegal Search Monopoly to Attract Advertisers to AdWords*

43.    Google began its existence as an internet search engine in 1998. Google found early success and quickly became the world's most popular search website. Google has since grown voraciously, both within internet searching and by expanding into other technologies. To fuel that expansion, Google developed sharp elbows and leveraged its size to exclude competitors from the marketplace. As a result, last year Google was held to have violated the Sherman Act by illegally monopolizing the online search market through its anticompetitive acts. *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024).

44.    Google's search engine monopoly has also fueled its transformation into the digital advertising goliath it is today. Though Google now penetrates countless technology categories, nearly 80% of its revenues come from just one: digital advertising.

45.     Google harnessed its dominance of internet search to generate immense advertiser demand. Google initially offered only text-based keyword advertising that appeared alongside its search results. Google named the tool that advertisers could use to buy search ads "AdWords." The ability to place targeted advertisements alongside search results of the world's dominant search engine attracted millions of advertisers—making AdWords a unique and unmatched source of advertiser demand.

46.     Sensing opportunity in the enormous demand these advertisers represent, Google extended AdWords beyond search results pages, and enabled advertisers to also use AdWords to purchase display ads on third-party websites.

### B.  Google Fortifies Its Advertising Dominance Through Acquisitions of DFP and AdX

47.     By 2007, the Google Content Network—which included AdWords, as well as AdSense, a basic tool for publishers to sell ad inventory on their websites—was the largest ad network tool in the world.

48.     Google recognized that to attract more sophisticated publishers, it would need a more comprehensive tool to allow them to manage their inventory: a publisher ad server. Google initially tried to develop its own ad server. However, an independent company, DoubleClick, had already built what was quickly becoming the go-to publisher ad server: DoubleClick for Publishers ("DFP"). As of 2007, DFP had achieved a 60% share in the publisher ad server market and had as customers nine of the top ten U.S. websites. Afraid of the competition it could face if another tech giant like Microsoft were to acquire DFP, Google moved first. Google abandoned its attempt to build a new ad server and acquired DoubleClick for $3.1 billion.

49.     Google's purchase price for DoubleClick was roughly $1 billion in excess of Google's internal valuations of the company. Google paid this premium for the strategic value

DoubleClick provided: Google's acquisition of the leading publisher ad server accelerated its efforts to use the unique demand from AdWords to attract the large, sophisticated publishers who need ad servers to manage their inventory.

50.     In this transaction, Google also acquired DoubleClick's nascent ad exchange: AdX. Today, Google continues to operate DFP and AdX as separate products, but under a single brand: Google Ad Manager, also known as GAM.

### C.  *Google Consolidates Its Market Power by Restricting AdWords Demand to AdX*

51.     After acquiring DoubleClick, Google moved swiftly to cement its dominance in the ad exchange and ad server markets. Google decided that in almost all cases, AdX would be the exclusive ad exchange for advertisers using AdWords. AdWords was and is a "singularly powerful source of digital advertising demand" because it is how advertisers also access users of Google Search. Liability Op. at 826.

52.     Google knew that publishers heavily relied upon the advertising demand of the many advertisers using AdWords. It also knew that making AdX the only path to AdWords advertisers would force those publishers to send their impressions to AdX. As reflected in internal discussions, Google's personnel understood their power to force publishers to use AdX in stark terms: "Our goal should be all or nothing—use AdX as your [ad exchange] or don't get access to our demand."

### D.  *Google Tightens Its Stranglehold Over the Ad Tech Stack by Tying AdX to DFP*

53.     On top of funneling this critical source of advertising demand to AdX, Google created the unlawful tie at the heart of its anticompetitive scheme: It conditioned publishers' access to that demand, available only through AdX, on publishers' use of Google's publisher ad server, DFP. Specifically, Google required publishers to use DFP to obtain real-time bids from AdX. As this Court found, "Through these two policies"—Google's coercive funneling of

advertiser demand through AdX, and restricting AdX real-time bids to DFP—"AdX became the 'glue that seal[ed] DFP' inventory to AdWords demand." Liability Op. at 826.

54.     Historically, the ad exchange auctions run by ad servers were not real-time auctions; rather, they followed a "waterfall" process. In this waterfall process, for any given impression, the publisher ad server ranked the bidding ad exchanges in a "waterfall" in terms of the price the ad server *estimated* they would bid, based on past performance. The ad server gave the ad exchange with the highest expected bid a chance to purchase the inventory at the estimated price. If the first ad exchange in the waterfall accepted the offer, the ad server awarded the impression to that exchange. Otherwise, the ad server gave the next exchange in the waterfall a chance to purchase the inventory at a lower price. This process continued until the ad server identified a winning bidder.

55.     But over time, the industry developed technology for ad exchanges to bid into ad servers' auctions in real time. This allowed ad servers to move away from a waterfall process reliant on imprecise *estimations* of how much each ad exchange would be willing to bid, toward real-time functionality where each ad exchange can run its own auction in real time and submit its highest *actual* bid to the publisher ad server in real time. This real-time bidding system—when functioning properly—creates value for publishers and advertisers alike. The advertiser who values the impression the most will bid the highest and will win the impression. At the same time, the publisher receives more money for that impression than if it had gone to a less-motivated advertiser.

56.     Google intentionally thwarted this technological progress in order to coerce publishers to use its ad server, DFP. Google has long been capable of submitting real-time bids

from AdX into publisher ad servers' auctions for any given impression. But ever since this technology developed, Google has refused to do so, and refuses to this day.

57.     Google initially allowed AdX to submit real-time bids only to DFP. AdX submits real-time, impression-specific bids to DFP that can be much higher than the bids it would otherwise submit under a static waterfall approach. Google ensures that rival ad servers cannot access that same real-time demand from AdX. Initially, this restraint took the form of requiring rival ad servers to offer impressions to AdX under a waterfall-type model, at a floor price equal to the ad server's estimate, based on historical data, of how much AdX was willing to bid. Such an estimate based on historical data often will be lower than bids that can be obtained through a real-time auction. Rival ad servers were therefore unable to maximize the price at which they sold a publisher's inventory in the same way that DFP could. This left publishers the choice of using DFP or leaving advertising revenue on the table—which was no choice at all.

58.     In 2014, Google changed its terms of service to accomplish the same result contractually—terms that continue to this day. Google prohibits publishers using rival ad servers from comparing bids from AdX with bids from rival ad exchanges in real time, effectively blocking rival ad servers' access to real-time bids from AdX. While Google claims it offers publishers using rival ad servers comparable access to AdX demand through something called "AdX Direct," as this Court found, AdX Direct is "not an 'economically viable substitute to accessing AdX through DFP' because it ha[s] rudimentary functionality, d[oes] not show the price that AdX [i]s offering, d[oes] not provide access to real-time bids, increase[s] latency, and d[oes] not permit publishers to place bids from AdX into real-time auctions with bids from other exchanges." Liability Op. at 825 n.16. Google employees discussed internally that AdX Direct may have been conceived to foil antitrust scrutiny.

59.     Google's restraints blocking rival ad servers' access to real-time AdX demand have accomplished their purpose. DFP's share of the publisher ad server market went from 60% in 2008 when Google purchased DoubleClick to the 90% share it has enjoyed for the last 10 years. As this Court explained, because of Google's restraints, "almost 'every other publisher ad server either went out of business or was sold for scrap' because Google has 'destroyed all competition' in the ad server market . . . . By forcing Google's publisher customers to use a product [DFP] they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share, the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising." Liability Op. at 863-64.

### E.  Google Further Squeezes Competing Ad Exchanges by Rigging DFP to Favor AdX with First Look

60.     In addition to forcing publishers to use DFP in order to access real-time demand from AdX, Google devised a series of policies meant to exclude competing ad exchanges bidding into DFP.

61.     Google called one of these policies "First Look." First Look enabled publishers using DFP to receive real-time bids from AdX for their impressions. But First Look also required publishers using DFP to give AdX the opportunity to buy an impression before any rival exchanges were given the chance to do so. Compounding the disadvantage to other ad exchanges, when non-Google exchanges were permitted to bid (i.e., because AdX declined the first look), they could only make "static" bids that had to be set in advance and could not account for real-time information about the true value of the specific impression. Beyond depriving rival ad exchanges of a fair chance to compete to win an impression, First Look deprived them of visibility into every impression that AdX won, robbing them of the opportunity to bid and lose—

and collect important data points that would have helped them optimize their bidding more broadly. First Look thus made it impossible for other ad exchanges to compete on a level playing field with AdX, and severely limited their ability to grow.

62.     AdX obtained its anticompetitive First Look at every impression that passed through DFP even when publishers would have preferred to rank other exchanges first to maximize revenues. Some large publishers expressed frustration with First Look, which they viewed as benefiting Google at their expense. Still, the vast majority of publishers continued to use DFP as their sole ad server due to DFP's unrivaled access to advertising demand, the high switching costs associated with changing to another ad server, and the dearth of competitive alternatives given Google's restraints that hampered competing ad servers.

### F. Google Artificially Restricts the Transactions Available to Rivals from Its Demand-Side Platform, DV360

63.     Google has employed additional pressure tactics on top of the AdX-DFP tie to further force publishers and advertisers to use its ad tech products and not rivals', including by leveraging the advertiser volume of its DSP, DV360.

64.     Though smaller advertisers may use basic tools like AdWords to bid on impressions, more sophisticated customers require a more sophisticated tool: the demand-side platform, or DSP. Large advertisers and advertising agencies use DSPs to manage their various sources of inventory from publishers, synthesize impression data to run more sophisticated advertising campaigns, bid into ad exchanges, and track performance. Google's DSP is known as Display & Video 360, or DV360, and is the single largest DSP. These programmatic buying tools that advertisers use to bid on impressions are distinct products that offer advertisers specific characteristics and uses advertisers cannot obtain with other tools, as they enable advertisers to manage their open-web display advertising spend and campaigns, interact with the ad exchanges

that forward open-web display impressions from publishers, and submit bids for such impressions, all at the scale required for programmatic open-web display advertising.

65.    Though programmatic open auctions for open-web display ads constitute a sizeable portion of ad buying, other forms of programmatic transactions remain important for publishers and advertisers alike. For example, programmatic guaranteed ad buying allows advertisers to secure a minimum volume of impressions from a specific publisher within a set price range. As another example, with preferred deals, certain advertisers have the option of bidding on a publisher's inventory at set prices before the impressions are made available to the broader market. Programmatic guaranteed buying, preferred deals, and other variations on programmatic buying and selling allow advertisers to more effectively target a specific audience.

66.    In programmatic guaranteed, preferred deals, and other variations on programmatic advertising, the same tools in the ad tech stack—a publisher ad server, an ad exchange, and programmatic buying tools—are used, but some terms of the deal are pre-negotiated.

67.    Google uses advertisers' demand for these variations on programmatic ad buying to warp competition in favor of its own tools. For example, Google makes certain types of programmatic guaranteed deals—including sponsored programmatic guaranteed deals, which deliver a guaranteed deal based on a budget without a predetermined impression-volume commitment—available only between DV360 and AdX, and not rival ad exchanges. Because these kinds of programmatic deals provide publishers with meaningful additional revenue from advertisers on DV360, this tactic places additional pressure on publishers to use Google's products to monetize their inventory.

19

68.     Google's competitors and competition suffer as a result of this exclusionary Google conduct. Competitors are unable to compete on an even playing field to be selected for these deals involving DV360 advertisers and in turn lose scale, volume, and revenue. Publishers and advertisers are also harmed, as they have fewer options to transact these types of deals.

### G. *Google Acquires AdMeld, a Tool Designed to Provide Publishers with Better Bid Transparency, to Shut It Down*

69.     Around 2010, a company called AdMeld developed a yield manager tool designed to give publishers more information about real-time prices for their inventory outside of Google's ad tech stack. Google viewed AdMeld as a threat to AdX that could encourage publishers to seek bids from competing ad exchanges and other sources of advertiser demand.

70.     In 2011, Google responded to this threat by acquiring AdMeld. Because yield managers like AdMeld had functionality that threatened Google's grip on the ad server and ad exchange markets, Google strategized to simply "pick[] up the [yield manager] with the most traction and park[] it somewhere." Liability Op. at 828. Post-acquisition, Google thus shut down many core AdMeld features, eliminating an avenue for the flow of information that would have facilitated publishers working with non-Google ad servers and ad exchanges. Google took these steps at the expense of its publisher customers for the purpose of excluding competitors to DFP and AdX.

### H. *Through Project Bernanke, Google Leverages Its Data Advantage to Squeeze Out Competing Ad Exchanges and Sources of Advertiser Demand*

71.     From at least 2013 and to this day, Google has planned or implemented several quasi-clandestine projects to exclude rival ad exchanges and strengthen AdX's dominance: Projects Bernanke, Global Bernanke, Bell, and Alchemist. These projects were all designed to deprive competing ad exchanges of the volume and scale required to compete.

20

72.     Google launched Project Bernanke around 2013. With Project Bernanke, Google targeted an average take rate—32%—that it sought to earn on AdWords demand across impressions from a given advertiser. When Google identified an impression associated with less competition, it would lower the bid from AdWords submitted to AdX while charging a proportionally larger fee. When Google identified a more competitive impression, it would subsidize the advertiser's bid with part of the surplus it had retained by charging higher fees on less competitive impressions. These tactics increased AdX's win rate, thus allowing Google to deprive rival ad exchanges of transaction volume and solidify AdX's dominance while maintaining supracompetitive profits.

73.     Project Bernanke was only possible because of the huge data asymmetry Google cultivated by purposely amassing dominant market shares at multiple levels of the ad tech stack—including by using data from DFP to give AdX a preview of bids from competing ad exchanges. Competing ad exchanges lacked access to equivalent data on the competitiveness of each bid and so were unable to similarly adjust their bids to win impressions. The effect of Project Bernanke is that AdWords advertisers—and by extension, AdX—won auctions for impressions even when advertisers on other ad exchanges had submitted higher bids. Project Bernanke succeeded in depriving rival ad exchanges of crucial impressions they needed to compete and also denied impressions to advertisers who valued them most.

74.     In 2014, Google launched a revised iteration of the program: Project Global Bernanke. Google targeted lower average take rates on impressions offered by "competitive" publishers—i.e., publishers Google thought might entertain switching to a rival ad server—while targeting higher average take rates on impressions offered by less competitive publishers that Google deemed "stuck" with DFP. Through Project Global Bernanke, Google again leveraged

21

the unfair advantages it had orchestrated for itself to cement its dominance across the ad tech stack and rig competition further in its favor.

75. Google continued to revise and adapt Project Bernanke as market dynamics shifted, through programs bearing their own names such as Project Bell and Project Alchemist. For example, after Google shifted to its Unified Pricing Rules in 2019, *see* section III.J.5 *infra*, Google's Project Alchemist ensured that it would maintain its unfair advantage over rival ad exchanges under these new auction rules.

76. According to the latest publicly available information, Google to this day continues to engage in iterations of Project Bernanke that depress revenue for publishers, cost more to advertisers, and unfairly disadvantage competitors to AdX.

### I.    Spurred by Google's Monopolistic Overreach, Publishers and Rival Ad Exchanges Develop Header Bidding

77. By 2014, AdX was winning a disproportionate 53% share of the impressions that passed through DFP. Publishers bristled at having to surrender their choice of business partners and ad technologies to Google to access precious AdWords demand.

78. Rival ad exchanges, publishers, and open-source advocates collaborated to develop a workaround to Google's restrictive policies. They created a new technology that allowed DFP users to receive real-time bids from multiple ad exchanges. This technology became known as "header bidding."

79. Header bidding allowed publishers who used DFP to receive real-time bids from other ad exchanges before passing an impression to AdX. The publisher would insert a string of code into the header of its webpage. When a user visited the webpage, the code would solicit bids for the impression from other ad exchanges without using DFP. The winning bid would become the price floor for the impression in DFP. AdX would then have the opportunity to beat

that real-time price. In effect, header bidding created fairer auctions for a publisher's inventory by negating AdX's First Look advantage and allowing all exchanges solicited by the publisher using DFP to bid in real time.

80.    Header bidding allowed rival ad exchanges access to far more inventory from publishers that used DFP. Publishers increased revenues rapidly simply by inserting a string of code on their websites. Advertisers had a better chance of winning an impression based on the amount of their bid regardless of which ad exchange they used. Google's competitors also gained access to more information about impressions and prices to inform their valuations.

### J.    *Google Perceives Header Bidding as a Threat and Moves to Quash It*

81.    Google soon realized the threat header bidding posed to its dominance. Google was still able to use DFP to give AdX an advantage in any auction, but the market share of header bidding was growing significantly. Google began to scheme technological and policy tools that would force publishers back to Google's platforms and "dry out" header bidding.

### 1.    *Last Look*

82.    While header bidding enabled competing ad exchanges to submit real-time bids to DFP, thus increasing their chances of winning the auction, Google did not place AdX alongside those rival ad exchanges in the same header bidding auction. Rather, the rival exchanges would compete in the header bidding auction, and then DFP would use the winning bid from that auction as the price floor for AdX to beat—giving AdX a "Last Look" at the impression after everyone else had already bid. This meant that AdX could win any impression simply by offering a small amount more than the highest rival exchange bid. AdX's Last Look rights not only gave it an unfair advantage vis-à-vis competing ad exchanges; it also deprived publishers of ad revenues because AdX only needed to beat the winning bid from the header bidding auction, rather than submit the true, potentially higher bid its advertisers would have been willing to pay

in a blind auction. "Last Look was another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process." Liability Op. at 864.

### 2. *Open Bidding*

83.     In 2018, after two years of testing informally, Google launched Exchange Bidding, which it subsequently renamed Open Bidding. While Google touted Open Bidding as a better version of header bidding, its goal was to stifle header bidding, create obstacles for competing ad exchanges, and move all pieces of the open-web display ad auction process back onto Google's systems.

84.     Google streamlined Open Bidding so that it was simpler for publishers to use than the workaround of header bidding, which required publishers to maintain code on their websites. However, Google's Open Bidding imposed a 5% mandatory fee on every transaction won by a rival ad exchange. AdX was not subject to the same fee. Google prohibited bids originating from rival ad exchanges' own DSPs or ad networks. Google forced competing ad exchanges to share their bid data with Google. Google also forced payments and transaction reporting from Open Bidding to run through Google's systems, eliminating an important point of contact for ad exchanges with their publisher customers.

85.     Google's Open Bidding succeeded in stunting the growth of header bidding and maintaining AdX's dominance. Competing ad exchanges—including Equativ and Sharethrough—were forced to participate in Open Bidding to reach DFP publishers. Like other ad exchanges, Equativ and Sharethrough were subject to the 5% rival ad exchange penalty and were forced to surrender valuable data to Google.

### 3. *Sell-Side Dynamic Revenue Sharing*

86.    Google sought to further advantage AdX and make header bidding comparatively unattractive by implementing a dynamic pricing model called sell-side dynamic revenue sharing ("SSDRS"). Publishers take ad exchange fees into account when ranking bids for an impression. Applying SSDRS, AdX would adjust its take rate—the percentage fee it charges the publisher for each sold impression—on an impression-by-impression basis. For competitive impressions—i.e., impressions that had received relatively high offers from rival exchanges through the header bidding auction—Google would drop AdX's take rate below its standard 20% to win the auction. On the other hand, where Google was confident that AdX would win an impression, it would increase its take rate to inflate its margins, knowing that the bid reduced by Google's extra fees would still secure the impression.

87.    Through SSDRS, Google was able to adjust the AdX bid up or down to beat the price offered by rival ad exchanges through header bidding, ensuring AdX won even more transactions at no cost, because it could recoup any discounts it applied on competitive impressions by hiking fees it charged on less competitive impressions. "Because third-party exchanges did not have Last Look to 'see all the bids' and vary their take rate accordingly," Liability Op. at 830, they were helpless to respond to AdX's use of SSDRS to game individual auctions. As a result, SSDRS caused competing ad exchanges to lose scale and revenue.

### 4. *Project Poirot*

88.    Even with the effectiveness of Open Bidding, Last Look, and SSDRS, Google remained concerned about header bidding and its threat to AdX. In 2017, Google launched Project Poirot to "dry out" header bidding once and for all.

89.    With Project Poirot, Google aimed to further entrench AdX's dominance—this time, by reducing bids that Google's DSP, DV360, submitted to competing ad exchanges that

25

participated in header bidding. In other words, the bids publishers received from DV360 advertisers through rival ad exchanges were lower than the same DV360 advertisers' bids received from AdX. Because publishers more frequently rejected these artificially reduced bids from rival ad exchanges, advertisers allocated an increasingly higher proportion of their advertising spend to AdX and away from rival exchanges. By Project Poirot 2.0, Google was reducing DV360 advertisers' bids submitted to rival ad exchanges by up to 90%, which resulted in advertisers shifting even more of their advertising spend to AdX. DV360 represents a substantial share of advertiser demand. Google's manipulation of DV360 traffic to AdX and away from its competitors thus caused a substantial loss of volume and revenue to competing ad exchanges.

### 5. *Unified Pricing Rules*

90.     Around 2019, based on the perception that Google was suffocating its ad tech competition to the detriment of publishers, advertisers, and competitors alike, Google faced growing pressure to make its open-web display ad auction process fair and transparent.

91.     Project Poirot and the details of SSDRS had not yet become public, so complaints centered upon Last Look. In response to industry dissatisfaction with Last Look, Google introduced yet another policy it claimed would benefit publishers, but in fact continued to artificially advantage AdX and insulate AdX from competition from rival ad exchanges: Unified Pricing Rules.

92.     Under Google's new Unified Pricing Rules, Google disallowed publishers using DFP from setting lower price floors for rival exchanges than for AdX. There are a variety of reasons why a publisher may wish to set a lower price floor for a competing ad exchange than for AdX. For example, a publisher might have a pre-negotiated volume discount threshold with a rival ad exchange, and might want to use a lower price floor as a way of steering more

transactions towards the rival ad exchange so as to meet the minimum volume threshold. Publishers also could use varying price floors to implement alternative deal structures which create value for both publishers and advertisers, such as programmatic guaranteed, preferred marketplace, or programmatic direct deals; the publisher would vary its price floors to ensure that the ad exchange running its bespoke deal structure won the designated impressions. Or, a publisher might simply wish to reduce its dependence on Google by steering transactions to rival ad exchanges. Through Unified Pricing Rules, Google removed this ability of publishers to use varying price floors to control their inventory across multiple ad exchanges.

93.     Internal documents confirm that the purpose of this new restraint was to decrease the volumes of impressions handled by rival ad exchanges. As one internal Google document explained, by "equaliz[ing] floors (i.e., get[ting] the Adx floors down), . . . [Google] will start seeing benefits in terms of buying more through AdX and decreasing incrementally on [third-party exchanges]."

94.     According to internal Google documents, its Unified Pricing Rules had a "negative effect on [third-party ad exchange] spend." Google's "best guess" was that these rules resulted in hundreds of millions of dollars of additional gross annual revenues to Google. Google achieved these profits at the expense of competitors of AdX, and to the detriment of its publisher customers—by preventing publishers who used DFP from choosing their preferred ad exchange and maximizing their revenues.

### K. Google's Anticompetitive Conduct Continues to This Day

95.     The foregoing anticompetitive conduct, made public through enforcement actions of the U.S. DOJ and European competition authorities, nevertheless continues to this day. Google continues to make AdWords advertiser demand exclusive to AdX. Google continues to restrict the availability of certain types of programmatic guaranteed deals with DV360

advertisers to AdX. Google continues to tie the advertiser demand accessed through AdX to use of DFP. Google still hobbles AdX and does not allow rival ad servers to put real-time bids from AdX in competition with real-time bids from other ad exchanges. Through Open Bidding, Google still applies a 5% fee on rival ad exchanges, cannibalizes rival ad exchanges' data, and prohibits bids originating from rival ad exchanges' own DSPs or ad networks. Google's Unified Pricing Rules still prevent publishers from directing impressions to ad exchanges of their choice. For bids submitted to rival ad servers, AdX still retains its Last Look advantage. Upon information and belief, Google continues to update its behind-the-scenes manipulation of auctions to disadvantage competitors to AdX, as illustrated by the ever-evolving iterations of Project Poirot and Project Bernanke.

## IV.    Relevant Markets and Google's Monopoly Power

### A.  *Relevant Product Markets*

#### 1.  *Publisher Ad Servers for Open-Web Display Advertising*

96.     "[P]ublisher ad servers for open-web display advertising constitute a distinct relevant product market." Liability Op. at 833-34.

97.     The publisher ad server is a mission-critical tool for website publishers. A publisher ad server manages publishers' ad auctions and placement in real time by putting multiple ad exchanges in competition with each other to fill impressions, determining which ad is displayed, and displaying an ad on the publisher's website each time an impression is sold. Ad servers also perform a host of other tasks to help publishers manage their inventory, such as creating reports on inventory performance. Large publishers cannot practicably manage their open-web display advertising without an ad server.

98.     Publisher ad servers for open-web display advertising perform a unique function in the ad tech stack. Publishers who want to monetize their websites cannot use tools that deal

solely with other forms of advertising, such as social media ads, search ads, video ads, or in-app ads. Other ad tech tools such as ad networks do not allow publishers to fill their impressions from varied types of demand, for example by allowing a publisher to fill some impressions via direct deals while using programmatic auctions to fill others. "Consequently, other ad tech tools are not reasonably interchangeable with publisher ad servers." Liability Op. at 834.

99.    The pricing structure of publisher ad servers is also distinct from other tools in the ad tech stack. Publisher ad servers generally generate revenues by charging large publishers a flat fee per each impression filled. This stands in contrast to the pricing structures of ad exchanges, which generally charge publishers a percentage-based fee on each impression sold. For large open-web publishers, publisher ad server fees typically average about 1% to 2% of the revenue generated by the sale of the impression, in contrast to the double-digit percentage take rate charged by ad exchanges. DSPs are also priced differently from ad servers, with DSPs charging fees to advertisers, as opposed to publishers.

100.    Ad tech industry participants, including publisher ad server operators, ad exchange operators, publishers, advertisers, and Google itself, recognize the unique and distinct features that publisher ad servers offer their customers, and view the publisher ad server as a distinct product in the ad tech stack. While Google recently combined its publisher ad server product, DFP, with its ad exchange, AdX, under a single Google Ad Manager brand, publisher ad servers can be and often are offered separately from other ad tech products, including ad exchanges and DSPs.

101.    A hypothetical monopolist of publisher ad servers for open-web display advertising could profitably impose a small but substantial, non-transitory increase in price or decrease in quality from the prices and quality that would prevail in a competitive market. Such a

hypothetical monopolist would not lose enough customers to different ad tech products, to other kinds of ads (e.g., video or in-app), or to self-supply to make the price increase or quality decrease unprofitable.

### 2. Ad Exchanges for Open-Web Display Advertising

102.    "[A]d exchanges for open-web display advertising constitute a distinct relevant product market." Liability Op. at 837.

103.    Ad exchanges serve a critical function of facilitating real-time auctions for open-web display ads in which advertisers can bid on inventory through programmatic buying tools such as DSPs and ad networks. Ad exchanges integrate and aggregate available inventory from ad servers, flag impressions as they become available, solicit advertisers' bids for each impression, and evaluate those bids within a fraction of a second to determine auction winners.

104.    Ad exchanges are involved in most programmatic open-web display transactions due to their unique ability to collect and rank ad bids from multiple buying tools and transmit winning bids to publisher ad servers in mere milliseconds. Ad exchanges are used not only for straightforward open auctions, but also to enable other types of programmatic transactions for open-web display advertising. For example, ad exchanges facilitate programmatic guaranteed transactions, programmatic direct deals, preferred deals, private auctions, private marketplace sales, and other forms of programmatic transactions. These variations on programmatic transactions increase value for everyone involved in the ad tech process by allowing advertisers to better target their desired publisher inventory, while providing publishers with more revenue per impression.

105.    Although there are ways for ad buyers to circumvent ad exchanges in limited volumes, such as making direct deals with publishers without the use of programmatic tools, the administrative burden and technical limitations of these other methods of buying and selling

display ads makes them impractical for use on a meaningful scale. Internally, Google observes that direct deals outside of ad exchanges are not scalable and require meaningful efforts to establish and maintain, and thus are not an option for most publishers. Ad networks, on the other hand, provide only minimal control over the sale of inventory and do not allow publishers to mix and match sources of advertiser demand. As a result, the overwhelming bulk of spending for open-web display advertising flows programmatically through ad exchanges. Sophisticated publishers who receive the majority of open-web display advertising revenue do not view non-programmatic direct deals or other more basic ad tech tools, such as the publisher-facing functions of ad networks, as substitutes for ad exchanges.

106.    Similarly, publishers who wish to monetize their websites cannot send impressions to ad exchanges that deal only in forms of advertising other than open-web display ads, such as social media ads, search ads, video ads, or in-app ads. Advertisers who wish to place open-web display ads also cannot use ad exchanges that only deal in other ad formats.

107.    The unique advantages of ad exchanges for open-web display advertising are widely recognized by industry participants such as publishers, advertisers, ad tech companies, and Google itself. They acknowledge that ad exchanges are a distinct product that offers features and functionality that differ from other ad tech products such as DSPs.

108.    Beyond this broad industry recognition, the unique capabilities of ad exchanges are reflected in the distinct prices that ad exchanges charge publishers. "[A]d exchanges . . . are priced differently than other ad tech tools." Liability Op. at 837. Ad exchanges typically charge publishers a percentage of the total winning bid for each impression, while publisher ad servers typically charge publishers a flat fee per impression sold.

109.    Though ad exchanges facilitate extremely fast transactions, they do not execute a simultaneous two-sided transaction for a publisher and advertiser. Rather, the publisher first interacts with its ad server—not an ad exchange—to flag impressions for sale. The publisher ad server then transmits impression data to one or more ad exchanges. The ad exchanges next pass information about the impression to buying tools used by advertisers: DSPs or ad networks. The advertisers interact with their own buying tools to indicate a bid for a given impression. The buying tools then submit a bid back to the ad exchange. The ad exchange chooses the winning bid from among the bids received; bidding on an impression does not guarantee that the advertiser will win the auction within the ad exchange. Then, the ad exchange submits the winning bid back to the publisher ad server, which chooses among the bids received from all of the ad exchanges to which the impression was sent, as well as any other sources of demand for that piece of the publisher's inventory. Only after the publisher uses its ad server to decide to accept a bid does it display the ad and bill the advertiser. Conversely, if a publisher has an unattractive impression or has imposed undesirable conditions on the sale of the impression, the publisher's ad server may send the impression to an ad exchange but fail to receive a bid in return.

110.    A hypothetical monopolist of ad exchanges for open-web display advertising could profitably impose a small but significant non-transitory increase in price or other worsening in terms from the prices and terms that would prevail in a competitive market. Such a hypothetical monopolist would not lose enough customers to different ad tech products, to other kinds of ads (e.g., video or in-app), to non-programmatic direct deals, or to self-supply to make the price increase or quality decrease unprofitable.

### 3.  *Ad Exchanges for Indirect Open-Web Display Advertising*

111.   "[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

112.   The market for ad exchanges for indirect open-web display advertising is a distinct submarket within the broader market for ad exchanges for open-web display advertising. This submarket includes ad exchanges for the sale of open-web display ads through auctions but excludes direct deals and programmatic guaranteed.

113.   Auctions conducted via ad exchanges are distinct from alternative methods for selling ad inventory. As the U.S. DOJ alleged: "Alternative methods and products for transacting ad inventory . . . such as direct deals[ and] programmatic guaranteed . . . are distinct in terms of inventory type, use cases, functionality, inventory constraints, and/or monetization." Complaint ¶ 291, *United States v. Google LLC*, No. 1:23-cv-108-LMB-JFA (E.D. Va. Jan. 24, 2023).

114.   A hypothetical monopolist of ad exchanges for indirect open-web display advertising could profitably impose a small but significant non-transitory increase in price or other worsening in terms from the prices and terms that would prevail in a competitive market. Such a hypothetical monopolist would not lose enough customers to different ad tech products, to other kinds of ads (e.g., video or in-app), to direct or programmatic guaranteed deals, or to self-supply to make the price increase or quality decrease unprofitable.

### B.  *Relevant Geographic Markets*

#### 1.  *Worldwide Market*

115.   A "relevant geographic market for both publisher ad servers for open-web display advertising and ad exchanges for open-web display advertising is worldwide," excluding "countries where the operation of ad tech companies is substantially restricted by government

censorship of the Internet (e.g., China) or U.S. economic sanctions (e.g., Iran)." Liability Op. at 847 n.26, 849. A relevant market for ad exchanges for indirect open-web display advertising similarly is worldwide.

116.    Competition among publisher ad server and ad exchange providers is global. "The globally networked nature of the Internet has resulted in worldwide competition among ad tech providers, with the speed of light serving as a primary impediment to intercontinental ad serving." *Id.* at 848. Publishers and advertisers interact with publisher ad servers and ad exchanges across borders. "Many U.S.-based advertisers target international Internet users, and many international advertisers target U.S.-based users, including by advertising on U.S.-based publishers' webpages. . . . Similarly, advertisers bid to target international users who visit U.S.-based publishers' pages, and Americans consume digital content from international publishers. . . . Ad tech providers, in turn, have built global infrastructure and often manage, price, sell, and track performance of their products globally." *Id*. (citations omitted).

117.    A hypothetical worldwide monopolist of publisher ad servers for open-web display advertising, ad exchanges for open-web display advertising, or ad exchanges for indirect open-web display advertising could profitably impose a small but substantial, non-transitory increase in price or decrease in quality from the prices and quality that would prevail in a competitive market.

### 2.    United States Market

118.    The U.S. markets for publisher ad servers for open-web display advertising, ad exchanges for open-web display advertising, and ad exchanges for indirect open-web display advertising are distinct submarkets within the respective worldwide markets. Market participants recognize this in the ordinary course of business. While Google, Equativ, and certain other market participants offer these ad tech products both within and outside the United States, there

are differences in publisher and advertiser preferences, language, and regulatory frameworks depending on the country in which a website or advertisement is meant to be viewed, and prices can vary by geography.

119.    As Google conceded with respect to the ad tech stack in its proposed findings of fact and conclusions of law in the U.S. DOJ case, a "relevant geographic market is the United States." Google's Proposed Findings of Fact ¶ 703, *United States v. Google LLC*, No. 1:23-cv-108-LMB-JFA (E.D. Va. Nov. 4, 2024). "[C]ompetitive conditions for display advertising vary by geography . . . [as a result of] the number of different languages spoken across countries . . . [and] as a result of regulatory regimes that vary between geographies . . . ." *Id.* ¶¶ 710-12.

120.    To serve customers in the United States, a publisher ad server or ad exchange provider generally must establish a physical presence in the United States, including employing engineers and a sales force that speaks English and can cater to the preferences of U.S.-based customers. For example, when Equativ entered the U.S. market around 2014, it did so not by simply beginning to sell its ad server product from overseas, but by establishing a physical presence in the country and developing local relationships with U.S.-based customers. Thus, U.S. customers do not effortlessly switch between publisher ad server and ad exchange providers based overseas and those based in the United States, making the United States a distinct relevant geographic submarket.

121.    A hypothetical monopolist of publisher ad servers for open-web display advertising, ad exchanges for open-web display advertising, or ad exchanges for indirect open-web display advertising in the United States could profitably impose a small but substantial, non-transitory increase in price or decrease in quality from the prices and quality that would prevail in a competitive market.

### C. Google Has Monopoly Power in the Relevant Markets

#### 1. Google Has Monopoly Power in the Worldwide and U.S. Markets for Publisher Ad Servers for Open-Web Display Advertising

122.    Google participates in the worldwide and U.S. markets for publisher ad servers for open-web display advertising through its ad server DFP.

123.    "Google possesses monopoly power in the publisher ad server for open-web display advertising market." Liability Op. at 850.

124.    Google's monopoly power is demonstrated by its ability to repeatedly and significantly degrade the quality of service provided by DFP over publishers' objections, without fear of losing those publisher customers to competing ad servers. For example, Google conducted its own internal analysis to gauge the potential impact of applying Unified Pricing Rules to deprive publishers of the ability to set a lower price floor for competitors of AdX. Google concluded that there was no meaningful risk that publishers would switch away from DFP, notwithstanding their dissatisfaction with the change. This internal assessment proved to be correct. Indeed, despite frequently acting in ways that frustrate and reduce choice and revenue for its publisher customers, DFP has maintained a persistent worldwide market share of over 90% and a U.S. market share between 86% and 92%.

125.    Google has also estimated internally that it possesses sufficient monopoly power such that the "market w[ould] bear" a significant increase in fees for DFP while simultaneously improving DFP's profitability, further indicating lack of meaningful competitive restraints in the market Google has unlawfully monopolized. Liability Op. at 852.

126.    The market for publisher ad servers for open-web display advertising presents significant barriers to new entry or expansion, not least of which is the immense effort and cost to a publisher of switching ad servers. In addition to switching costs, "building a publisher ad

server is a complex, resource-intensive process, even for a large corporation," and "it is very challenging to gain publisher ad server customers." Liability Op. at 850-51. Through its anticompetitive conduct, Google has erected further barriers to entry and expansion of new competitors, reinforcing the durability of its market power.

127.    As a result of Google's acquisition of its monopoly and the use of its monopoly power to maintain its position in the market for publisher ad servers for open-web display advertising, rivals such as OpenX have either left the ad server business or pivoted to other markets. Even the tech giant Meta shut down its project to build a publisher ad server due to the impossibility of gaining scale in a market unlawfully monopolized by Google.

### 2. Google Has Monopoly Power in the Worldwide and U.S. Markets for Ad Exchanges for Open-Web Display Advertising and Indirect Open-Web Display Advertising

128.    "Google possesses monopoly power in the ad exchange for open-web display advertising market." Liability Op. at 852. Google similarly possesses monopoly power in the market for ad exchanges for indirect open-web display advertising.

129.    Google's ad exchange, AdX, has long been the dominant ad exchange for open-web display advertising. AdX maintains a durable share of roughly 60% of the global market, "roughly nine times larger than the share held by Google's next-largest competitor, which had only 6% of the market." *Id*. at 855. AdX similarly maintains a durable share of roughly 50% of the U.S. market.

130.    Google's ability to maintain its market share while degrading service for its customers and charging supracompetitive prices is direct evidence of its monopoly power in the ad exchange market. Google recognizes that it imposes an extraordinarily high take rate of 20% for transactions on AdX—significantly higher than the take rate of rival ad exchanges, which often charge closer to 10%. And Google has profitably maintained AdX's 20% take rate even

when other exchanges decreased their take rates as the market matured. Despite lower rates and innovative products, Google's competitors have been unable to discipline Google's high prices. Google typically refuses to negotiate AdX's take rate and offers only minimal discounts to a small number of large customers. Internally, Google estimated that it could adjust its take rate significantly without meaningfully affecting its market share.

131.    Barriers to entry and expansion also inhibit other ad exchanges from challenging Google's monopoly. "Scale and network effects are crucial for ad exchanges . . . ." Liability Op. at 856. The need for scale poses a chicken-and-egg problem for Google's putative ad exchange challengers, who must grow large enough to attract publishers and advertisers without already enjoying a critical mass of business.

132.    Google has utilized its market power in adjacent segments of the ad tech ecosystem to further raise entry barriers in the ad exchange market by deliberately making it difficult for advertisers and publishers to switch to existing and potential ad exchange competitors. For example, Google's policies have made AdX the only ad exchange with meaningful access to AdWords, a source of unique advertising demand that publishers highly value. This anticompetitive policy foreclosed an entire segment of the addressable market from potential ad exchange competition. Internally, Google employees have observed that Google's anticompetitive restraints left both publishers and advertisers with very little choice but to keep using AdX.

## V.    Google Has Already Been Found Liable for Monopolizing Relevant Markets and Tying

133.    Recognizing the potential illegality and competitive harm stemming from Google's domination of the ad tech stack, the U.S. DOJ launched a multi-year investigation into Google's conduct around 2019.

134.    At the close of their investigation, DOJ—joined by the Attorneys General of numerous states—concluded that Google had monopolized markets for publisher ad servers for open-web display advertising, ad exchanges for open-web display advertising, and advertiser ad networks for open-web display advertising in violation of Section 2 of the Sherman Act, both in the United States and worldwide. The DOJ and the Attorneys General also concluded that Google had violated Sections 1 and 2 of the Sherman Act by tying its AdX and DFP products. On the basis of these monopolization and tying claims, the DOJ and the Attorneys General filed a civil complaint against Google in the U.S. District Court for the Eastern District of Virginia on January 24, 2023: *United States v. Google LLC*, No. 1:23-cv-108-LMB-JFA.

135.    In September 2024, U.S. District Judge Brinkema held a three-week trial on the DOJ's claims. The DOJ and Google called 39 live witnesses, read designated deposition testimony of an additional 20 witnesses, and admitted hundreds of exhibits.

136.    On April 17, 2025, having considered the parties' arguments and the voluminous record, Judge Brinkema issued a 115-page opinion finding Google liable for violating the Sherman Act. Among other things, Judge Brinkema held:

a.    Publisher ad servers for open-web display advertising worldwide constitute a relevant product market. Liability Op. at 833-37, 848-49.

b.    Ad exchanges for open-web display advertising worldwide constitute a relevant product market. *Id.* at 837-40, 848-49.

c.    Google's tying of real-time bids from AdX to the use of DFP was an unlawful tie (*id.* at 859-63) and an anticompetitive means to create and maintain monopoly power (*id.* at 863-64).

d. Google engaged in anticompetitive conduct to acquire and maintain monopoly power by implementing First Look, Last Look, SSDRS, and Unified Pricing Rules. *Id.* at 864-65.

e. Google illegally acquired and maintained monopoly power in the worldwide publisher ad server market for open-web display advertising. *Id.* at 850-52, 859-65.

f. Google illegally acquired and maintained monopoly power in the worldwide ad exchange market for open-web display advertising. *Id.* at 852-56, 859-65.

137. Equativ and Sharethrough now file this lawsuit pursuant to 15 U.S.C. §§ 15, 15b, and 16(i), challenging the same conduct found by Judge Brinkema to violate the Sherman Act, in addition to Google's anticompetitive iterations of Project Bernanke, Project Poirot, and other tactics that Google uses to defang competition from ad exchanges that could challenge AdX.

## VI. Google's Anticompetitive Conduct Has Harmed Competition and Injured Equativ and Sharethrough

138. Equativ and Sharethrough have repeatedly attempted to win business from Google in the relevant markets. At every turn, they have been thwarted by Google's restraints. As a result of Google's anticompetitive conduct, and despite their best efforts, Equativ and Sharethrough have lost customers and transaction volume; have failed to win customers and transactions that they would have won in a competitive market; earned reduced profits on the business they kept; and were frustrated in building the scale needed to compete in ad tech.

139. By limiting AdWords and DV360 advertiser demand to AdX and limiting access to AdX's real-time bids to DFP, Google has made it virtually impossible for competing ad servers, including Equativ's, to compete with Google's DFP. The large share of advertiser demand captured by Google's programmatic buying tools—AdWords and DV360—is "must-

have" for the vast majority of publishers. To gain effective access to this demand through AdX, publishers must use Google's DFP. As Judge Brinkema found, "For all practical purposes, . . . Google's tying DFP to AdX communicated to publishers that if they used a rival publisher ad server, they would be shut out of AdX's core functionality." Liability Op. at 861.

140.    Time and time again, Equativ has lost business to Google, or failed to win new business from Google, for the expressly stated reason that the customer must use DFP and AdX to effectively access AdWords and DV360 demand. These include customers who were dissatisfied with Google's ad server product and who actively sought out alternatives, only to ultimately conclude that they had no choice but to remain with Google.

141.    For example, in late 2022, following Google's hollow commitments to the French Competition Authority to cease its anticompetitive restraints, a major publisher customer of Google's switched from DFP to Equativ's ad server. One year later, the publisher reluctantly returned to Google. The customer explained to Equativ that it had no choice but to return to Google because without using Google's tools, the customer could not access advertiser demand through AdX and could not transact certain programmatic guaranteed deals with DV360 advertisers.

142.    As another example, after years of struggling to acquire new publisher ad server customers in the face of Google's anticompetitive conduct, Equativ launched a "Google Replacement Program" to seek to win business from DFP. Equativ invested substantial resources in the program, including hiring a strategy advisor who had close connections with large publishers and whom Equativ tasked with the singular mission to convert Google ad server clients to Equativ. Over the course of roughly two years, Equativ pitched over 25 large publishers to migrate their ad server business.

143.    As Equativ's CEO, Arnaud Créput, reported in testimony in the U.S. DOJ proceedings: "[W]e had more than 25 shots . . . . Each time, this was a no-go. . . . [I]t was never about product features. It was never about level of service, which [is] considered by our clients as much better than [DFP]. . . . [I]t was always for two reasons. Number one, switching costs. Google makes it very [difficult] to switch from their solution to other solutions. And number two [wa]s the fear of losing revenues [due to losing] access to . . . Google AdX[,] . . . Google Ads and DV360."

144.    By coercing advertisers to use AdX and by cutting off rival ad servers' access to that advertiser demand, Google destroys the possibility for rival ad servers like Equativ to compete on the merits for publishers' business. Indeed, as Judge Brinkema found, "almost 'every other publisher ad server either went out of business or was sold for scrap' because Google 'destroyed all competition' in the ad server market through its AdX-DFP tie and associated activities." Liability Op. at 863-64.

145.    When Equativ loses (or fails to gain) a publisher ad server customer due to Google's anticompetitive restraints, it suffers damage at numerous levels of its business. Most directly and immediately, Equativ loses publisher ad server business. But Equativ also loses the ad tech transaction data associated with that customer, which hampers its ability to compete effectively with Google's DFP. When Equativ loses an ad server customer to Google's DFP, it often loses corresponding ad exchange business, because DFP artificially favors AdX over rival ad exchanges. And Equativ reaps lower profits from the business it retains.

146.    Meanwhile, Google's restraints favoring AdX over rival ad exchanges have significantly hampered the ability of rival ad exchanges, including Equativ and Sharethrough, to compete. Whether taking the form of coercing AdWords and DV360 advertisers to use AdX;

First Look; Project Bernanke and its progeny; the handicaps Open Bidding placed on rival ad exchanges; Last Look; SSDRS; Project Poirot; Unified Pricing Rules; or any of its other anticompetitive acts, Google's restraints had the same anticompetitive effect: They insulated AdX from competition, blocked rival ad exchanges including Equativ and Sharethrough from gaining business, enabled AdX to capture a majority share of the ad exchange market despite its comparatively rudimentary capabilities, and allowed AdX to charge supracompetitive take rates.

147.    As Judge Brinkema already found: "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." Liability Op. at 864. "By giving AdX 'an advantage in winning the transaction,' . . . First Look 'made it difficult' for other exchanges 'to compete on a level playing field with AdX,' . . . thereby impeding their ability to enter the market, grow, and compete. . . . In addition to providing a revenue advantage, First Look also gave Google a data advantage that helped the AdX team train its auction bidding models more effectively." *Id.* at 827.

148.    "Open Bidding . . . discriminated against non-AdX exchanges, including by extracting a 5% fee from their bids, by prohibiting them from submitting any bids that originated from their own demand-side platforms or ad networks, and by requiring them to share their bid data with Google." *Id*. at 829.

149.    "Google's Last Look . . . harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." *Id*. at 864. "Being able to view its competitors' bids provided Google and its advertising customers with a 'significant informational advantage,' . . . that 'significantly disadvantaged other competitors' in the ad exchange space." *Id.* at 829.

150.   "The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share. . . . By using the Last Look informational advantage to vary AdX fees and win impressions that it would have lost in a fair auction, Google has further enhanced AdX's market power at the expense of rivals, thereby reducing competition and harming its publisher customers' ability to diversify their revenue sources away from Google." *Id*. at 865.

151.   As a result of Project Poirot, "AdX's main competitors . . . saw their revenue from DV360 advertisers decrease by an average of 15%." *Id*. at 830.

152.   "Unified Pricing Rules increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges. . . . The overall result of Unified Pricing Rules was that Google's ad tech products continued to gain scale in the display advertising space while rival ad tech products lost scale." *Id*. at 831.

153.   Google's anticompetitive practices, taken together, have enabled it to amass and maintain monopoly power in the relevant ad server and ad exchange markets to the exclusion of rivals including Equativ and Sharethrough. Google's conduct that coerces publishers to use Google's DFP instead of rival ad servers directly harms competition and rivals in the relevant ad server markets, but also reverberates in the relevant ad exchange markets. The more broadly publishers use DFP, the greater the effects of Google's harnessing of DFP to artificially advantage AdX and exclude rival ad exchanges.

154.   Likewise, Google's conduct that coerces advertisers to use AdX and that confers artificial advantages on AdX directly harms competition and rivals in the relevant ad exchange markets. However, this conduct also reverberates in the relevant ad server markets. The more

widely AdX is used and the greater the volume of impressions it handles, the more indispensable AdX becomes to publishers. In turn, publishers are left with no choice but to use DFP in order to effectively access AdX demand. Each of Google's anticompetitive practices thus mutually reinforces and amplifies the others, both within and across the relevant markets.

155.    This is equally true across the various programmatic transaction types such as open auctions, programmatic direct, and programmatic guaranteed deals. For publishers selling impressions via open auctions, effective access to AdX demand is essential. Google's AdX-DFP tie thus drives the majority of publishers to DFP. DFP in turn perverts competition by favoring AdX to win DFP's auctions, for example by charging a tax for the use of a rival ad exchange in Open Bidding and by preventing the publisher from implementing a lower price floor for a rival ad exchange. This drives an artificially higher number of open-auction transactions through AdX, depriving rivals like Equativ and Sharethrough of the revenues and scale they need to effectively compete.

156.    With programmatic direct and programmatic guaranteed deals, the advertiser and the publisher may agree outside of the ad tech stack on a deal with specific terms such as a guaranteed volume of impressions at a set price, but they still use the programmatic tools of the ad tech stack—including a publisher ad server and ad exchange—to transact and serve the deal. In a market untainted by Google's restraints, the advertiser and publisher could freely choose which ad server and ad exchange to use, and often they would opt for the non-Google ad tech provider that facilitated the deal in the first place.

157.    For example, Equativ and Sharethrough routinely curate unique inventory from a publisher with a unique advertiser's needs in mind, and facilitate the match between the publisher and the advertiser. The publisher may desire to use Equativ's or Sharethrough's ad

exchange to implement the transaction. But Google has used its anticompetitive AdX-DFP tie to force the majority of publishers onto DFP. Because of Google's Unified Pricing Rules, these publishers cannot cause DFP to route the sale through Equativ's or Sharethrough's ad exchange by setting a lower floor price than for AdX. As a result, AdX, not Equativ's or Sharethrough's ad exchange, transacts these sales and takes a double-digit cut for deals Google had no role in arranging, while depriving Equativ's and Sharethrough's ad exchanges of crucial volume.

158.    As a result of Google's anticompetitive conduct, Equativ's ad server and Equativ's and Sharethrough's ad exchanges have handled fewer impressions, have earned lower profits on the impressions they did process, and achieved a fraction of the scale they would have achieved in the absence of Google's anticompetitive restraints. The other side of this coin is that Google's restraints have insulated Google from competition from rivals like Equativ and Sharethrough, enabling Google to degrade its services and charge supracompetitive prices with little consequence to Google.

## VII.    Equativ's and Sharethrough's Claims Are Timely

159.    Equativ and Sharethrough assert their claims under the Sherman Act. Claims under the Sherman Act generally are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b.

160.    However, "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws," the statute of limitations for any other party's claims based in whole or in part on any matter complained of in the United States' proceeding is suspended for the pendency of the that proceeding and for one year thereafter. 15 U.S.C. § 16(i).

161.    Equativ's and Sharethrough's claims herein are based on the matters complained of by DOJ in its proceeding instituted January 24, 2023, *United States v. Google LLC*, No. 1:23-

cv-108-LMB-JFA (E.D. Va.). Accordingly, the statute of limitations for Equativ's and Sharethrough's claims has been suspended since January 24, 2023, and will remain suspended until one year after DOJ's proceedings conclude.

162.    Equativ's and Sharethrough's Sherman Act claims based on Google's anticompetitive conduct that accrued on or after January 24, 2019 therefore are timely.

163.    The continuing wrong doctrine also serves as a basis to refresh the statute of limitations. Though Google's anticompetitive conduct in ad tech began as early as 2007, it has since that time continuously innovated and renewed its efforts to harm businesses it viewed as threats to its illegal monopoly, engaging in new, discrete acts enabling Google to maintain and expand its monopolistic grip on the relevant markets and causing harm to Equativ and Sharethrough. For example, Google has perpetually innovated on its efforts to advantage AdX in programmatic auctions through projects such as First Look, Last Look, SSDR, Project Bernanke and all of its iterations, Open Bidding, and Unified Pricing Rules.

164.    Similarly, Google's use of the enormous buy-side demand it controls to force publishers onto DFP and AdX began as a simple tie, but evolved into complex and shifting measures such as Project Poirot, where Google used artificially low bids from DV360 to deprive competing ad exchanges of volume and push advertisers to AdX and DFP. Though the initial version of Project Poirot launched in 2017, Google continued to experiment with and apply new, increasingly harmful variations of the program through at least 2019.

165.    Project Bernanke provides another instance of Google's renewal and reinforcement of its anticompetitive acts. Through Project Bernanke, Google would overcharge certain advertisers on noncompetitive auctions and put the proceeds into a slush fund that it then used to surreptitiously subsidize AdX bidders in closer contests, applying its size and data

advantage to deprive its competitors of scale and volume. As Google adjusted its auction mechanics over the years, it pursued successive programs to maintain the unfair advantage that Project Bernanke gave to AdX. Some of these programs received their own independent code names, such as Project Bell and Project Alchemist. For example, from 2019 through 2021, Google modified various pieces of its ad tech stack to transition to a first-price auction. To ensure that AdX continued to edge out rival ad exchanges, Google launched Project Alchemist to update Bernanke's algorithms for this new model.

166.    As Google updated and added to the mechanisms it used to maintain its illegal monopoly, it continuously layered new overt acts on top of its prior anticompetitive conduct that renewed and compounded the harms Google has caused to competition, Equativ, and Sharethrough. As an example, each time Google imposed a fee for the use of Equativ's SSP or Sharethrough's STX in association with Open Bidding, it performed an independent act that inflicted new harm on Equativ or Sharethrough.

167.    Because of the mutually reinforcing nature of Google's conduct in the ad server and ad exchange markets, when Google commits a new act directly affecting the ad exchange markets (for example, by artificially advantaging AdX), that act also contributes to Google's monopolization of (and exclusion of rivals in) the ad server markets. When Google skews auctions to drive impression volumes to AdX, this in turn drives more advertisers to use AdX. AdX demand becomes that much more necessary to publishers, with the result of increasing pressure on publishers to remain with DFP. For this reason, Judge Brinkema found that Unified Pricing Rules, for example, "enhance[d] the AdX-DFP tie." Liability Op. at 110. Over time, and continuing to this day, publishers, advertisers, competitors, and even internal Google employees have asked Google to cease the acts Google has used to force publishers and advertisers onto

AdX and DFP. Google has repeatedly rejected those pleas and affirmatively decided to continue the anticompetitive acts that have enabled it to monopolize the relevant ad server and ad exchange markets.

168.    Google's fraudulent concealment of its anticompetitive conduct, most notably of SSDRS and Project Poirot, further tolls the statute of limitations.

169.    Google launched SSDRS in 2014. As discussed at section III.J.3 *supra*, Google's SSDRS relied on data from DFP to rig auctions. Google lowered the take rate for AdX on individual auctions so that AdX would win even where advertisers on a competing ad exchange had bid higher. Google then recouped these lower take rates by overcharging where it did not believe it needed to outbid a competing ad exchange.

170.    Google concealed the details of its SSDRS from the marketplace, including Equativ and Sharethrough. Google did not acknowledge SSDRS publicly until 2016. When asked for explanations of the policy, Google refused to provide details. After its launch in 2016, Google misrepresented on its website and elsewhere that the program was a yield benefit to publishers, even while acknowledging internally that if they ran SSDRS well, it could "result in lower publisher overall revenue." Google personnel internally discussed that because of the data that AdX accessed through DFP, competing ad exchanges would be powerless to respond to the advantage SSDRS conferred on AdX. Google also misrepresented on its publicly facing website that it terminated SSDRS in 2019. Indeed, Google has acknowledged in internal documents that SSDRS was active as recently as 2020.

171.    Because SSDRS took place within the black boxes of DFP and AdX, SSDRS and its effects were by their nature self-concealing. Further, Google concealed and misrepresented the program's goals and effects after SSDRS became public in 2016. Equativ and Sharethrough

therefore did not know and could not discover through the exercise of reasonable diligence the details of Google's SSDRS, or the harms Equativ and Sharethrough suffered as a result. Equativ and Sharethrough learned the purpose and mechanics of Google's SSDRS, and the harms it caused to Equativ and Sharethrough, only after a decision by the French Competition Authority finding that Google abused its dominance in the ad server market in 2021.

172.    Google also used its DSP for large advertisers, DV360, to depress the volume of business of AdX's competitors, and shift that volume to AdX, in a scheme it named after Agatha Christie's punctilious Detective Hercule Poirot. *See* section III.J.4 *supra*. Through Project Poirot, Google surreptitiously lowered DV360's bids to competing ad exchanges. As a result, Google decreased the number of impressions flowing through competing exchanges. Google hoped that Project Poirot would "dry out" those competing exchanges.

173.    Google concealed Project Poirot and these efforts to deprive competing ad exchanges of the volume they needed to thrive. Google purposely introduced Project Poirot gradually, to obfuscate its effects while evaluating its efficacy. Google varied the amount by which it depressed bids from DV360, making it more difficult to detect. Google never made Project Poirot public, and its bid shading took place wholly within the black box of Google's internal algorithms. Project Poirot was by its nature self-concealing, and Google's efforts to further obfuscate the project and its effects meant that Equativ and Sharethrough could not have discovered through the exercise of reasonable diligence the details of the project. Equativ and Sharethrough learned of Project Poirot only after DOJ filed its suit against Google in 2023.

174.    Google and its personnel even schemed to destroy any record of their anticompetitive acts in their internal communications. After DOJ launched their investigation of Google, Google employees deleted internal chats relating to the subject of the investigation. One

50

Google executive told subordinates that subjects "too sensitive for email" should be discussed in an auto-deleting chat app—even after a litigation hold was already in place requiring Google to preserve those records. Liability Op. at 872.

175.    Finally, Equativ and Sharethrough are entitled to recover damages resulting from Google's pre-January 24, 2019 anticompetitive conduct, which would have been too speculative to recover if Equativ and Sharethrough had filed their complaint sooner. For example, had Equativ and Sharethrough filed a complaint against Google in 2013 for violations of the Sherman Act based on Google's restriction of AdWords demand to AdX and restriction of AdX real-time bids to DFP, their resulting past and future damages from that conduct—particularly when combined with and magnified by Google's later but then-unforeseeable conduct—would have been too speculative to recover.

176.    The compounding harms from Google's disadvantaging of competing ad exchanges through First Look, Last Look, SSDRS, Open Bidding, Project Bernanke, Unified Pricing Rules, Project Poirot, and linking certain types of demand from DV360 to the use of AdX similarly could not have been ascertained until the programs were all publicly revealed and the passage of time allowed observation of their effect on markets involving complex auctions. Only now that Google's conduct has been publicly revealed in its totality, and the effects of its conduct observed, are Equativ and Sharethrough able to bring suit for the resulting damages.

**VIOLATIONS ALLEGED**

**COUNT ONE**

***Monopolization and Monopoly Maintenance of Publisher Ad Servers for Open-Web Display Advertising (15 U.S.C. § 2)***

177.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 176 as though fully set forth herein.

178.    "Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market . . . ." Liability Op. at 1.

179.    The worldwide market for publisher ad servers for open-web display advertising constitutes a relevant market. The U.S. market for publisher ad servers for open-web display advertising also constitutes a relevant market. Google has monopoly power in both markets.

180.    Google has acquired and maintained monopoly power in the worldwide and U.S. markets for publisher ad servers for open-web display advertising through the anticompetitive conduct described herein, including but not limited to:

a.    First Look;

b.    Last Look;

c.    SSDRS;

d.    Open Bidding;

e.    Project Poirot;

f.    Unified Pricing Rules;

g.    Conditioning access to certain types of programmatic demand from DV360 on using DFP and AdX;

h.    Tying access to real-time bids from AdX to using DFP; and

i.    Conditioning access to AdWords demand on use of AdX.

181.    Each of the anticompetitive acts described herein is independently anticompetitive, but also is part of a broader exclusionary course of conduct. Each of Google's anticompetitive acts has had a cumulative and compounding effect with the other acts. Google undertook these acts with the intent to achieve and maintain its monopoly.

182.     Google's anticompetitive conduct has reduced revenues for publishers, has increased prices and costs for advertisers, has harmed competing ad servers and ad exchanges, has resulted in poorer matches of advertisements and impressions, and has diminished innovation in advertising technology.

183.     No legitimate or procompetitive purpose justifies Google's anticompetitive conduct, and any purported procompetitive justification or effects are outweighed by the anticompetitive effects of the conduct.

184.     Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

185.     Equativ competes and has competed with Google in the worldwide and U.S. markets for publisher ad servers for open-web display advertising.

186.     Google's anticompetitive conduct has injured and continues to injure Equativ's ability to compete in the worldwide and U.S. markets for publisher ad servers for open-web display advertising, causing Equativ to lose business, fail to win new business, and earn lower profits on the business that remains. Google's anticompetitive conduct has also negatively impacted ad exchanges like Equativ's and Sharethrough's, including because Google's unlawfully acquired power in the worldwide and U.S. markets for publisher ad servers for open-web display advertising allowed it to make programmatic changes within DFP that favored AdX and harmed AdX's competitors. These are the sorts of injuries that the antitrust laws were enacted to prevent. Equativ and Sharethrough have suffered and will continue to suffer substantial damages and irreparable injury as a result of Google's anticompetitive conduct.

187.    Equativ and Sharethrough seek past and future damages for the injury Google has caused and continues to cause under 15 U.S.C. § 15, as well as injunctive relief against threatened loss or damage by Google's violation of the antitrust laws under 15 U.S.C. § 16.

## COUNT TWO

### *Monopolization, Attempted Monopolization, and Monopoly Maintenance of Ad Exchanges for Open-Web Display Advertising (15 U.S.C. § 2)*

188.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 176 as though fully set forth herein.

189.    "Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the . . . open-web display ad exchange market . . . ." Liability Op. at 1.

190.    The worldwide market for ad exchanges for open-web display advertising constitutes a relevant market. The U.S. market for ad exchanges for open-web display advertising also constitutes a relevant market. Google has monopoly power in both markets.

191.    Google has attempted to acquire, acquired, and maintained monopoly power in the worldwide and U.S. markets for ad exchanges for open-web display advertising through the anticompetitive conduct described herein, including but not limited to:

a.  First Look;

b.  Last Look;

c.  SSDRS;

d.  Open Bidding;

e.  Project Bernanke and its many iterations;

f.  Project Poirot;

g.  Unified Pricing Rules;

h.   Conditioning access to certain types of programmatic demand from DV360 on using DFP and AdX;

i.   Tying access to real-time bids from AdX to using DFP; and

j.   Conditioning access to AdWords demand on use of AdX.

192.   Each of the anticompetitive acts alleged herein is independently anticompetitive, but also is part of a broader exclusionary course of conduct. Each of Google's anticompetitive acts has had a cumulative and compounding effect with the other acts. Google's acts created a dangerous probability of success of achieving monopoly, and ultimately led to its monopoly. Google undertook these acts with the intent to achieve and maintain its monopoly.

193.   Google's anticompetitive conduct has reduced revenues for publishers, has increased prices and costs for advertisers, has harmed competing ad servers and ad exchanges, has resulted in poorer matches of advertisements and impressions, and has diminished innovation in advertising technology.

194.   No legitimate or procompetitive purpose justifies Google's anticompetitive conduct, and any purported procompetitive justification or effects are outweighed by the anticompetitive effects of the conduct.

195.   Although Google seeks to frame its anticompetitive conduct as an attempt to balance the interests of various market participants, in practice Google's unlawful conduct only benefited Google while harming advertisers, publishers, and competitors. Google's conduct has harmed the market as a whole.

196.   Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

197.    Equativ and Sharethrough compete and have competed with Google in the worldwide and U.S. markets for ad exchanges for open-web display advertising.

198.    Google's anticompetitive conduct has injured and continues to injure Equativ's and Sharethrough's ability to compete in the worldwide and U.S. markets for ad exchanges for open-web display advertising, causing Equativ and Sharethrough to lose business, fail to win new business, and earn lower profits on the business that remains. Google's anticompetitive conduct has also negatively impacted ad servers like Equativ's, including because Google's unlawfully acquired power in the worldwide and U.S. markets for ad exchanges for open-web display advertising allowed it to coerce publishers to use DFP and not rival ad servers. These are the sorts of injuries that the antitrust laws were enacted to prevent. Equativ and Sharethrough have suffered and will continue to suffer substantial damages and irreparable injury as a result of Google's anticompetitive conduct.

199.    Equativ and Sharethrough seek past and future damages for the injury Google has caused and continues to cause under 15 U.S.C. § 15, as well as injunctive relief against threatened loss or damage by Google's violation of Sherman Act § 2 under 15 U.S.C. § 16.

## COUNT THREE

### *Monopolization, Attempted Monopolization, and Monopoly Maintenance of Ad Exchanges for Indirect Open-Web Display Advertising (15 U.S.C. § 2)*

200.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 176 as though fully set forth herein.

201.    The worldwide market for ad exchanges for indirect open-web display advertising constitutes a relevant market. The U.S. market for ad exchanges for indirect open-web display advertising also constitutes a relevant market. Google has monopoly power in both markets.

202.    Google has attempted to acquire, acquired, and maintained monopoly power in the worldwide and U.S. markets for ad exchanges for indirect open-web display advertising through the anticompetitive conduct described herein, including:

a.  First Look;

b.  Last Look;

c.  SSDRS;

d.  Open Bidding;

e.  Project Bernanke and its many iterations;

f.  Project Poirot;

g.  Unified Pricing Rules;

h.  Conditioning access to certain types of programmatic demand from DV360 on using DFP and AdX;

i.  Tying access to real-time bids from AdX to using DFP; and

j.  Conditioning access to AdWords demand to use of AdX.

203.    Each of the anticompetitive acts described herein is independently anticompetitive, but also is part of a broader exclusionary course of conduct. Each of Google's anticompetitive acts has had a cumulative and compounding effect with the other acts. Google's acts created a dangerous probability of success of achieving monopoly, and ultimately led to its monopoly. Google undertook these acts with the intent to achieve and maintain its monopoly.

204.    Google's anticompetitive conduct has reduced revenues for publishers, has increased prices and costs for advertisers, has harmed competing ad servers and ad exchanges, has resulted in poorer matches of advertisements and impressions, and has diminished innovation in advertising technology.

205. No legitimate or procompetitive purpose justifies Google's anticompetitive conduct, and any purported procompetitive justification or effects are outweighed by the anticompetitive effects of the conduct.

206. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

207. Equativ and Sharethrough compete and have competed with Google in the worldwide and U.S. markets for ad exchanges for indirect open-web display advertising.

208. Google's anticompetitive conduct has injured and continues to injure Plaintiffs' ability to compete in the worldwide and U.S. markets for ad exchanges for indirect open-web display advertising, causing Equativ and Sharethrough to lose business, fail to win new business, and earn lower profits on the business that remains. Google's anticompetitive conduct has also negatively impacted ad servers like Equativ's, including because Google's unlawfully acquired power in the worldwide and U.S. markets for ad exchanges for indirect open-web display advertising allowed it to coerce publishers to use DFP and not rival ad servers. These are the sorts of injuries that the antitrust laws were enacted to prevent. Equativ and Sharethrough have suffered and will continue to suffer substantial damages and irreparable injury as a result of Google's anticompetitive conduct.

209. Equativ and Sharethrough seek past and future damages for the injury Google has caused and continues to cause under 15 U.S.C. § 15, as well as injunctive relief against threatened loss or damage by Google's violation of Sherman Act § 2 under 15 U.S.C. § 16.

## COUNT FOUR

### *Unlawful Tying (15 U.S.C. §§ 1 & 2)*

210.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 176 as though fully set forth herein.

211.    "Google . . . has unlawfully tied its publisher ad server (DFP) and ad exchange (AdX) in violations of Sections 1 and 2 of the Sherman Act." Liability Op. at 1.

212.    "Publisher ad servers and ad exchanges are two separate products that are not reasonably interchangeable. . . . [They] serve different functions, use different pricing structures, and are recognized as different products by industry participants." *Id.* at 860 (internal quotation marks omitted).

213.    "Google . . . possessed sufficient economic power in the tying product market to restrain competition in the tied product market. . . . Google has monopoly power in the [worldwide] open-web display ad exchange market . . . ." *Id.* at 862. Google similarly has monopoly power in the worldwide and U.S. markets for ad exchanges for indirect open-web display advertising, and the U.S. market for ad exchanges for open-web display advertising.

214.    Publishers view AdX as necessary to their businesses because of AdX's exclusive access to AdWords demand and its access to DV360 demand. "Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP. This coercive policy made purchasing DFP, the tied product, together with AdX, the tying product, the only viable economic option for publishers . . . ." *Id.* at 861 (internal quotation marks omitted).

215.    "[T]he AdX-DFP tie . . . has a large and substantial impact on interstate commerce." *Id.* at 863.

216.     Google's anticompetitive tying has substantially foreclosed competition and has harmed Equativ and Sharethrough, causing Equativ and Sharethrough to lose business, fail to win new business, earn lower profits on the business that remains, and achieve lower market shares than they would have but for Google's anticompetitive tying. These are the sorts of injuries that the antitrust laws were enacted to prevent.

217.     Equativ and Sharethrough have suffered and will continue to suffer substantial damages and irreparable injury as a result of Google's anticompetitive tying.

218.     Equativ and Sharethrough seek past and future damages for the injury Google has caused and continues to cause under 15 U.S.C. § 15, as well as injunctive relief against threatened loss or damage by Google's violation of Sherman Act § 2 under 15 U.S.C. § 16.

## REQUEST FOR RELIEF

219.     Wherefore, Plaintiffs respectfully request that the Court enter judgment in their favor and against Google by:

a. Enjoining Google's anticompetitive conduct and mandating that Google take all necessary measures to cease such conduct and restore competition under 15 U.S.C. § 16;

b. Declaring that the restraints alleged herein are unlawful;

c. Awarding as monetary relief (including treble damages) under 15 U.S.C. § 15(a) compensatory, consequential, and punitive damages for all past, current, and future injuries directly and proximately caused to Plaintiffs by Google, as described herein, according to proof, as well as the costs of suit, including attorneys' fees;

d. Awarding any other equitable relief necessary to prevent and remedy Google's anticompetitive conduct; and

e. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

220.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Complaint so triable.


Dated: October 13, 2025                    Respectfully Submitted,


/s/ Serine Consolino

Serine Consolino (VA Bar No. 95481)
**AEGIS LAW GROUP LLP**
801 Pennsylvania Ave NW, Suite 740
Washington, DC 20004
Tel. (202) 737-3500
sconsolino@aegislawgroup.com

Nicolas Stebinger (*pro hac vice* forthcoming)
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Tel. (202) 384-3130
nicolas@simonsensussman.com

Catherine Simonsen (*pro hac vice* forthcoming)
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Tel. (917) 747-5196
catherine@simonsensussman.com

Shaoul Sussman (*pro hac vice* forthcoming)
Kate Brubacher (*pro hac vice* forthcoming)
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Tel. (646) 693-3929
shaoul@simonsensussman.com
kate@simonsensussman.com

*Counsel for Plaintiffs*